I'd like to call the calendar, the day calendar, first, please. Will counsel indicate your presence? Gramercy, Wrecking, and Environmental. President Rohnert. President Rohnert. Good morning. Force v. Facebook. President Rohnert. Good morning. United States v. Richards. President Richards. Good morning. And the final case, Lando v. Eisenberg, is on submission. We'll hear the first case, Gramercy Wrecking. Good morning, Your Honors. My name is Daniel Barnes. I represent the appellant. I'm from the law firm of Chiesa, Shannon, and John Tomasi. The issue in this case is whether by signing the job site agreement, an appellant, Gramercy, agreed to be bound by the respondent union's collective bargaining agreement, or CBA, including the mandatory arbitration provision in the CBA. Doesn't that, as you've just said, the JSA clearly indicate that you agree to, and I quote, abide by all terms and conditions of employment for the CBA? Your Honor, it does say that, but I think you're taking it a little bit out of context. I think what the JSA does is it lists a subset of CBA provisions for which the JSA applies. At the very least, there's a subset that says to make contributions to the welfare and pension funds for various fringe benefit plans. Is that a subset, too? Your Honor, what the JSA does is it picks certain clauses, certain terms and conditions of the CBA, and incorporates those into the JSA. These are sophisticated parties, Your Honor, particularly the union and the welfare fund. If they had wanted full incorporation, they could have just simply said the collective bargaining agreement and all its terms and conditions are hereby incorporated by reference. It's a very simple sentence. That's all they had to do. They didn't do that. It seems to me that you went about this the wrong way. It seems to me you got a demand for withdrawal liability from the fund, right? That's correct. And then you came running into federal court to get a declaratory judgment against the fund and the union, right? Correct, to say that we did not have withdrawal liability. But ordinarily under the MPPAA, there would be an arbitration for an employer who's challenging withdrawal liability, right? But our position was that the MPPAA did not apply because the CBA did not apply. So you think that parties can contract out of being an employer under the MPPAA? Although we're an employer, although we're making contributions to the fund, we'll have an agreement among ourselves that that doesn't count. Do you think you can do that? I think we can, Your Honor, and we did, and these JSAs are not uncommon in this industry. Well, but you made contributions to the fund, right? Correct. And so you were an employer at a time, right? Your Honor, but the JSA explicitly says in its final sentence, the amount of the required payment shall be measured by the hours of work performed by the owner, operator, and subcontractor's employee. And then finally, this agreement is effective as of the date above set forth and shall remain in full force effective until such time as the job described above, which this agreement covers, is completed. We're done. But you are an employer. You're just saying that it ended in 2012 or 2011, right? Effectively, yes, Your Honor. Okay. But then that seems to me your argument is really that we're not liable because we're no longer in the business, right? Isn't that really your argument? That's a defense at an arbitration. It's not saying you're not an employer. Your Honor, I think you're putting the cart before the horse. You have to get to the arbitration first, and that's the sole issue that was decided before the district court. The MPPAA provides for arbitration, right? It does. It doesn't matter whether you contracted it or whether it's in the CBA. The MPPAA requires arbitration for an employer who's challenging withdrawal liability, right? Yes. So why isn't that where you ought to be first? And then if it turns out that you have withdrawal liability, then you can try to go against the union to cover the costs that you're stuck with. Your Honor, but again, it goes back to what I said a moment ago, which is we're putting the cart before the horse, which is in order to be subject to the MPPAA, we have to be part of the CBA. No, you have to be an employer, right? We have to have both, Your Honor. Are you saying, just so I'm clear, are you conceding? That you are an employer for ERISA purposes? We're not, Your Honor, because the JSA doesn't make us one. So if we were to agree with you that the district court improperly dismissed your claims against the fund, given that the fund and the union are separate entities and the fund is not a party to the agreement, then why shouldn't we just remand to the district court to consider in the first instance whether you are an employer with respect to ERISA? That's exactly what you should do, Your Honor. That's one of the options this court has, and that's an option we would advocate for. Because ultimately, Your Honor, this was a motion to dismiss. We never considered any of the factual issues that happened. On page 9 of our brief, there's a reference to an affirmation or an affidavit put in by the president of Gramercy with regard to his communications with the leadership of the union about what the JSA was going to mean. And the court didn't consider that. It went solely to the issue of whether or not we incorporated by reference the entirety of the CBA. And again, if you look on page 827 of the record, that's not what it says. It lists a subset of CBA provisions that are going to apply to this JSA. I'm still confused. Are you disputing that your client was an employer obligated under the MPAA to make payments to the plaintiff's pension fund at some point during the life of the period covered by the JSA? Are you disputing that? Yes, Your Honor. You're disputing that you were obligated to make payments to the pension fund. No, we're not disputing that we were obligated to make payments to the pension fund because that's in the JSA. But statutorily, we never got to the issue of whether or not the MPAA applied because the district court immediately found the arbitration was required. We never got to any of those issues. We don't have to find that you're an employer anyway. We just have to conclude that you were under an obligation to make these contributions under our prior decisions, right? I'm not sure that's right, Your Honor, because the JSA is what controls here, and the JSA does not say arbitration. Well, what about the Cordiello case? I'm sorry. In Cordiello, we said in the absence of a statutory definition of employer, we have construed the term as a person who is obligated to contribute to a plan. Weren't you obligated to contribute to a plan by the JSA, you think? Yes, but the JSA also says it ends. And so it's the last sentence of the JSA. Once it ends, that's the end of our obligation. The JSA, you have to understand here, Your Honor, this was a very small part of a much larger job. Our clients were called in to do, we all know, are familiar with the giant stadium construction project. This was the demolition of that. Our clients had a very small role in that. They needed specialized services. Union labor was required. Our client came in, did a very small part of a much larger job. It never would have agreed to the CBA and all of this subsequent liability had it known that it was being forced to incorporate by reference the CBA in the JSA. It never agreed to that. But they agreed to make contributions to the fund, right? They did during the time they were paying the employees, but not after that. That's what the JSA says. So are there lots of people making contributions to the fund that are not employers? Your Honor, the record is silent on that. That's not what we're here to talk about. Can I make contributions to the fund? I'm sorry? Can I make contributions to the fund? I would have assumed not. I assume that the fund would probably take your money, but no. Thank you. Thank you, Your Honor. Good morning, Your Honors. Benjamin Carfunkle, Law Office of Newman Carfunkle, on behalf of Trucking Employees of North Jersey Welfare Fund, comma, Inc. Can I ask you to focus on Gramercy's claims against the fund? Understand the arguments with respect to Gramercy's claims against the union. But with respect to the fund, and correct me if I'm misunderstanding, the district court never addressed whether Gramercy is an employer or not because it dismissed the petition on the grounds that Gramercy was required to pursuant to the terms of the agreement with the union. So why shouldn't we just remand for the district court to consider the question in the first place? Your Honors, that would be a viable option because the district court did not address that issue. And I think that is the issue that there's a cart before the horse, find out whether or not Gramercy was an employer. Is there a dispute about it? I do not believe there's a dispute, but if that's the issue that the district court wants to address to confirm that, that would resolve all the issues, I believe, with respect to whether or not they have to go forward with arbitration. Because I believe once the district court confirms that they are an employer because they did make contributions to the fund, that would require them to submit to arbitration under the rules of MAPA. As Korea Shipping in my brief mentioned, that once you have an obligation to contribute to the fund, whether or not you believe the JSA is a CBA or any other document, they were making contributions pursuant to the collective bargaining agreement with the union. The JSA is silent as to their rate of contributions. They admitted in their petition that they contributed a set amount. The CBA discusses what the rate is on an hourly basis. They made payments for a few years. Even though the JSA says it's only raised in the force and effect until such time as the job described above, that is correct. They only have to make contributions while they're working on this job. Withdrawal liability is a different entity than contributions to the fund. They only may have to make contributions to the fund during that time period. But once they withdraw from the fund as an employer, they're obligated to make withdrawal liability payments if that's so assessed. Why did it take five years to send them the bill? As the counsel mentioned, it was a demolition job. With regards to the union, they don't know when an employer ceases. There's no letter that goes out to the union saying, now we have ceased our employment, now we have ceased our job. So the union sometimes, it takes a while for them to realize no contributions are coming in, and therefore they then discuss with their actuaries whether or not to assess a withdrawal liability. But sometimes it does take some time from the last contribution to the union and to the fund to realize that it actually is a cessation of employment and therefore triggering a withdrawal liability. What's the withdrawal liability calculated on? The actual number of the withdrawal liability? $122,000. How is that calculated? That's based on actual rates. It's also based on the contributions they've made into the fund, the rate, how many hours they've contributed. But it's also assessed as to what the deficiency the fund has currently incurred at the time of withdrawal. So even though we're now... It's based on their participation in that fund, though. It would be based on their participation in the fund as well. Entirely? That would be a portion of the actuarial calculation. So the answer is not entirely. It seems odd that they paid $71,000 while they were working on the job, and then five years later they get this bill out of nowhere for $622,000. Is that the way this usually works? There is no typical way it usually works, but that would be an issue before the arbitrator to... If they wanted to challenge the withdrawal liability calculations, that would be something for the arbitrator to determine. Do you know what made up the $622,000? It would be based on their highest contribution rate, the hours worked, and also the fund's deficiency at the time of their withdrawal. Those would be some of the key calculations. The deficiencies calculated not only on their participation in the project, but others as well. Correct. On all employers that contributed to the fund. On the employer question, although it may seem commonsensical, the answer, the district judge explicitly, and this is in the decision on 168 appendix, says contrary to both parties' contentions, the issue in this case is not whether petitioners should be deemed an employer under ERISA, exposing it to withdrawal liability for benefits, contributions. Petitioner would have made had the parties' JSA continued. At least that is not the issue yet. So it didn't, I mean, you can see that the district court didn't address that question. Correct, Your Honor. Even though the answer may seem commonsensical. That's correct, Your Honor. So what would be the inquiry? What's the factual dispute or what would be the relevant facts to determine whether Gramercy was an employer? I don't believe there are any facts in dispute. I believe Gramercy made contributions pursuant to the collective bargaining agreement to the fund and that by definition makes them an employer under MAPA and that would require them to go to arbitration. When you say pursuant to the collective bargaining agreement, the collective bargaining agreement determined what the rates would be and how you could devise the ultimate payment schedule? Yes, Your Honor. Thank you. So that's not in dispute is what you're saying? I don't believe that's in dispute, Your Honor.  Good morning, Your Honors. My name is Brady M. Conaton, co-leader Montalbano M. Conaton, on behalf of Teamsters Local 560. Local 560 submits that there is no contractual dispute between the union and Gramercy. It is unequivocal, as Judge Kogan recognized, that the JSA explicitly incorporated the CBA and all terms and conditions of employment of the CBA. The fact is that a contract, the JSA or the CBA, cannot circumvent ERISA and the MPAA. That wasn't the basis of the first decision. That's what Chief Judge Castner just pointed out. He said we don't need to deal with that because the CBA was incorporated. So what do you have to say about that? About which piece, Judge? Why are you relying on the MPPAA, then, in your argument? The MPAA actually doesn't apply to Local 560. That is an issue for the pension fund. My sole issue and the union's sole issue is whether or not there is a contract between the two parties, and there is. There's the JSA and the CBA. And the second piece of my argument, of the union's argument, is that Judge Kogan's opinion provides for contractual arbitration as opposed to withdrawal liability arbitration, to which the union is not a proper party. So, I mean, if we send it back to Judge Kogan, where we find that there's no real factual dispute that Gramercy is an employer, it seems to me it's all premature for you, isn't it? In other words, there could be withdrawal liability found or not found. And if that's the case, then there's no need to drag you into this at all, right? That is the union's position, yes, that the union is not privy to anything that happens with the pension fund. That is a totally separate, as I set forth in my brief, that is a totally separate legal entity. The notices don't go out to the union. Their argument is, though, that if they're on the hook for all this withdrawal liability, it was based on misrepresentations made by your union, and so they're planning to come after you for indemnification or some other equitable remedy, right? And that very well may be their argument, but as Mr. Barnes acknowledged, these were sophisticated parties. If there was some kind of an agreement, well, first of all, if the union, if the president of the union had somehow been given the authority by the pension fund and by the board of trustees of the pension fund, you would have to first have that authority in order to even enter into that kind of agreement. Second, if there was that kind of agreement, it would have had to be reduced to writing, because these are sophisticated parties. And second, there would have to be a question of whether or not the parties could even agree to circumvent the law and the statute. So those would have to be questions that would need to be answered before the union is even brought into this case, after the butcher liability proceedings are completed. The GSA doesn't reference the CBA's terms regarding arbitration, correct? It does not specifically say the word arbitration or arbitration clause, no. But it does say that the company agrees to abide by all terms and conditions of employment for its employees. So it puts you into the situation. If there was a disciplinary matter, would the individual, the grievance, be entitled to grieve that pursuant to the arbitration procedure? I would submit and the union would submit that the union could bring that grievance pursuant to the arbitration procedure on behalf of that employee. Do you think there's any dispute as to whether or not Gramercy was an employer? Under the contract or under ERISA? Under ERISA. I don't think it's the union's position to weigh in on that, because the union isn't involved in that kind of a determination. That is something between the pension fund and the employer, or Gramercy, to prevent duplicative use of the word employer. Isn't part of the agreement that the union is an employer? I'm sorry? The fund is not part of this litigation. The pension fund? Directly. The pension fund is part of the litigation, Your Honor. No, I'm not. I mean the fund itself on the ERISA determination is not weighed in on it. The pension fund is a part of the litigation. The pension fund is the one who issues the notice and demand for withdrawal liability. The union has no part in any of that. That is all the pension fund's actuaries and the pension fund's board of trustees. They handle that entire piece. The union is completely separate from that. The fund is not a party to the GSA is what I mean. That is correct. The fund does not negotiate with employers for the provision of terms and condition of employment for employees. That's correct. Thank you. Thank you. Mr. Barnes, you have two minutes. Thank you, Your Honor. There are a couple of different things that are driving this, but mostly it's the economic deficiency that the welfare fund has. I think the panel rightly asked about the amount of the liability as compared to the actual amount of money our clients pay to these particular employees. When you understand the minimal amount of money that was paid to these employees, you understand that our clients never would have agreed to the CBA given the small role at the job. New York law, as we said in our briefs, and as the court acknowledged, requires clear evidence when you incorporate an extrinsic document into your actual contract. That didn't happen here. If you read the GSA, it's selecting certain provisions. At the very least, the district court could have found that it was ambiguous and considered the affirmation of Mr. Parcial, who testified about his conversations with the union about what was being done here. So what is the inquiry to determine whether or not Gramercy was an employer? Among other things, whether or not it was making contributions pursuant to the GSA or whether or not it was making contributions pursuant to the CBA that it accepted, it was a purely contractual matter under the GSA. What they could have done is taken the actual written language of the CBA and actually spelled it out in the GSA. They could have said these are the rates of payments, this is the amount of how we're going to make you calculate what other liabilities you have, and they could have done that. If they had done that, that would make them not an employer under the MPAA? Your Honor, that's an inquiry for the district court. Well, I know, but I'm trying to figure out what are you asking the district court to do, and is there a dispute about the facts? Whether or not this was purely a matter of contract under the GSA or whether or not the CBA was incorporated entirely. Okay. But what's your basis for saying that parties can contract around employer status for purposes of contributions to a pension fund? Your Honor, this goes to the larger issue of what was going on here. This was a very small part of a much larger project. Our clients would never have agreed to this liability, and certainly the affirmations that were ignored by the district court bear that out. This is a situation where a very large risk that was borne out of future liability was imposed upon this employer based upon representations that turned out not to be true. Look, it seems to me your defense is really one for an arbitration on withdrawal liability. I think your brief indicated that your client is no longer in the business in that jurisdiction, right? That's correct. So that's the reason why you wouldn't be subject to all this withdrawal liability, right? But our position is that we were never in the business in that jurisdiction because the JSA said we weren't. So you just made contributions to the fund without being an employer. Yes. Thank you. Thank you, both. Thank you, all three, for your arguments. We appreciate them.  We'll hear the next case on the calendar. Wars versus Facebook. Mitch Capps. Good morning, Your Honor. Mayor Capp from the Office of Plaintiffs' Appealants. In an appeal like this, I think it's very easy to lose the forest to the trees. So I'd like to start. The details are important. We're going to get back to them, but I'd like to start taking a step back and just looking at the appeal more broadly. I think that it's important because it will help us to see a little bit the extent of the district court's error and the very significant burden facing Facebook in this appeal. There are seven distinct issues that Facebook has to win on all of them, and the briefs make clear, I think, that the issues turn very heavily in plaintiffs' favor. Number one, and we're going to get back to this one specifically in a moment, the Communications Decency Act applies extraterritorially. Number two, the Communications Decency Act hasn't been raised prematurely. Number three, Facebook's very active role for profit, I might add, doesn't amount to the development even in part of any Hamas content. Number four, plaintiffs' anti-terrorism claims somehow relate to Facebook's duties as a publisher. Number five, the ETA does not civilly enforce federal criminal counterterrorism statutes, even though Congress said that they do. Number six, the affirmative defense created by Section 230, which is federal common law based on statute, but a federal common law derivation from the statute, which has no textual basis, does not yield to the express statutory commands of the ETA. And number seven, the more specific and later enacted ETA does not control when in conflict and to the extent of the conflict with the CDA. Regarding extraterritoriality, Congress has made – sorry, the Supreme Court has made clear many times that Congress does not legislate extraterritorially unless it says so, unless it indicates intent to legislate extraterritorially. And everyone admits that the CDA does not apply – that it was not intended to apply extraterritorially. There's nothing in the statute itself that indicates an intent for extraterritorial application. And all of the facts here, all of the relevant conduct that is pertinent to this case, and any – all pertinent conduct occurred overseas. Well, the pertinent conduct is that there was litigation filed here, right? The litigation is not conduct that Congress is regulating. Well, the – arguably, according to Facebook, right, the carve-out for Internet service providers not to be treated like speakers is designed to protect them from domestic litigation, right? Yes, and so, too, every cause of action. But Morrison makes clear that the fact that you have a cause of action doesn't make you – doesn't make the – doesn't put the case – doesn't put the relevant conduct of the case where the cause of action is exercised in a district court. Well, the definitional provision could be understood to regulate conduct. If you look at 230C1, regulating lawsuits against interactive computer services and their users. So just going back to Judge Sullivan's question, why isn't it the case that the objects of the statute solicitude are the service providers and users being sued, so that a suit in an American court amounts to a domestic application of a statute? Congress of the CDA, the entire CDA, is very clear from the enactment, is very clear from the titles that Congress gave this statute. C is called Protection for Goods Merit in Blocking and Screening of Offensive Material. Congress is trying to clean up the Internet. That's very clear. And defining the words publisher and speaker in the context of Internet providers, what Congress is doing was enabling private enterprise, a vehicle through which to go through that process of cleaning up the Internet without risk of liability. Can I ask about the extraterritoriality issue? Sure. And that is the cases from the Supreme Court, I think Judge Sullivan pointed this out, seem to regulate conduct of statutes, whether it's criminal conduct or civil conduct, in other words, securities violations or RICO. Those cases that say we're not going to reach into other countries unless the statute says that we should, so the presumption applies. But here it's a defense in a court of the United States, kind of like a statute of limitations defense. Immunity is like that, whether it's qualified immunity or sovereign immunity. Those are defenses that are posed in the courts of the United States. Isn't that different in the extraterritoriality analysis, whether you're regulating conduct that could be abroad or just the courts of the United States? I don't think it's different from the cause of action, Your Honor. Why? Because the cause of action gives a plaintiff, a would-be plaintiff, the right to state his claims in a federal court. The cause of action looks at the conduct that you did outside of the United States, whether you're trading securities from London or engaging in a RICO conspiracy in Europe. That regulates the conduct. Those are codes of conduct that we're trying to enforce. But here it's like a statute of limitations defense or immunity defense. Well, respectfully, it's not like a statute of limitations defense because it's a defense on the merits. It gets to the merits of what we're talking about, that is, the conduct that occurred overseas. So, first of all, I wouldn't concede that a statute of limitations automatically applies extraterritorially, the conduct that's entirely extraterritorial. But even arguendo, accepting that point, that's entirely not on the merits, and this very clearly is a merits defense in that it talks about the merits of the case and the conduct that Congress was regulating, which in this case occurred overseas. So immunity defense relates to the merits of the case, the conduct of the case? Any immunity defense? I'm trying to analogize this to whether it's regulating conduct abroad or is more in the nature of an immunity defense like qualified immunity or sovereign immunity. Where does this fall in the analysis? That's a good question. Qualified immunity, I think, is a difficult one. I'm not sure of any case that it deals with qualified immunity in this context. Prosecutorial immunity, for example, maybe would be more like a statute of limitations because you're looking at the person. It doesn't really matter what they did, or judicial immunity, same thing. It's the person in that role that is immune. Regardless of what he did wrong, it might have been egregious. But as long as it's in the course of employment or whatever the guidelines are, that might be different. Again, I'm not taking a position. I don't think the Supreme Court has spoken to this. My inclination would be to say that it doesn't make any difference. But I will concede that would be a harder case. How would you respond to the view that your analysis on extraterritoriality creates a rather gaping loophole in the regulatory structure that Congress set up in the CDA, if you could just hear me out and tell me where the understanding may be wrong? So a plaintiff could now sue a provider or a user of an interactive computer service for content that was posted by a third party so long as the content was posted and displayed outside of the United States. And doesn't that open people up to liability for a lot of conduct? Congress is trying to protect children within the United States, U.S. citizens, certainly. So a U.S. citizen abroad might be a different case, if maybe that's what you're getting to. But certainly Congress was most primarily acting within the United States. A child who accesses material that should have been, in Congress's view, protected from that child within the United States the case would be a lot closer. I mean, obviously it depends on the circumstances. Let me give you a specific example. Could someone bring a defamation lawsuit over a story on the BBC's U.S. website that describes information provided by someone in the United Kingdom? About a U.S. citizen? Yeah. I would think that would be domestic conduct. I mean, you're talking about the injury is experienced within the United States. Okay. So if a plaintiff tries, under your analysis, tries to hold a service provider or user liable based on content posted abroad, she would have to overcome the presumption against extraterritoriality to bring her claim in the first place, right? Yes. So what about when plaintiffs bring common law causes of action where there may not be that presumption against extraterritoriality? I'm not sure where you're going, but the presumption deals with Congress's work. I just want to understand how you see this all working. Yeah. No, a pure common law claim shouldn't be subject to the presumption against extraterritoriality. It's just a presumption, which is rebuttable. Thank you, Your Honor. If you want to take a few more minutes, go ahead, because you have a big case. It is a big case. We'll give you extra time as well. Thank you, Your Honor. Let's turn to the affirmative defense issue. As this Court made clear in Ricci, and other courts as well have said so, including, by the way, Zarin, which is a very interesting source for this, the Fourth Circuit case, the affirmative defense created by the Communications Decency Act rather creates an affirmative defense, which must be raised after an answer is filed and pursuant to the answer. It is not appropriate in a 12B6 motion unless the complaint makes the defense inevitable. If the allegations in the complaint, in a defamation case it's most simple, makes very clear that the defense ought to apply because we're attributing the defamatory contents to the Internet service, that's a different story, but that's not the case here. You don't have clear allegations in the complaint that make the defense inevitable. Because of that, it's Facebook's burden to allege that, first of all. Why is that though? You've got a 134-page complaint. Why isn't there enough before the district court to conclude, even on the pleadings, that this defense should be found in a 12B6 setting? Well, first of all, yes. What else does the district court need to know? The complaint, I think, makes very clear that we're not saying that we're attributing third-party content to Facebook, certainly not within its duty as a publisher or speaker. We're saying that Facebook took a very active role over here. The allegations in the complaint call into question the elements of the affirmative defense. It's Facebook's burden, secondly. And because of that, it's Facebook's obligation to allege the facts. Now, if the complaint, again, made the defense inevitable, that's a different story. But I'm saying that's not this complaint. It's Facebook's burden to allege facts necessary to assert the defense, and it's Facebook's burden to state a case as to why the defense ought to apply. That never really happened. Facebook moved under 12B6. But it was moving on the basis of allegations that I would argue certainly don't make it inevitable. You know, we can argue about the extent to which it's a closed question. I think it's not. But it's certainly not inevitable that the defense applies. And in that context, it's inappropriate to address the issue at this point. Facebook has to put in an answer and allege facts and give us a circumstance, a set of facts to argue about so we can determine the district court in the first instance. But under, you know, following Ricci, right, there are no magic words that have to be uttered. And as I look at the memorandum of Facebook's memorandum of law in support of its motion to dismiss, it did assert that the elements of CDA immunity were satisfied as to the family's complaint and put forth arguments as to each element. Why isn't that enough? It put forth arguments, but as I recall, it didn't parse the complaint. It didn't really address allegations in the complaint, certainly not in total. Putting forth argument isn't enough. They have to allege facts. And as I said, the complaint doesn't make it inevitable, and that's the standard. The complaint argues that they're liable because of the inflammatory statements made by Hamas, by their tendency to incite using the Facebook medium. Isn't that exactly what you're alleging? No, Your Honor. We're alleging that Facebook is, with regard to the primary liability issues, which is different from secondary liability, which I didn't get to. Secondary liability has a different analysis. But speaking of primary liability in the first instance, we allege that the material on Facebook's website approximately caused the injuries that the plaintiff suffered. But Facebook's duty, and that's the important word here. I'm looking for the name of the case right now. It's escaping my memory. But one of this court's cases says this very clearly, that Facebook's duty doesn't arise as a publisher or a speaker, and that's what's important. Facebook's duty arises as a citizen, not to support terrorists. And Facebook violated that duty. That duty is independent of anything that Facebook said or didn't say. But they're supporting terrorism by doing what? They're supporting terrorism by giving Facebook a platform, sorry, by giving terrorists, by giving Hamas a platform, by giving Hamas networking capabilities, by facilitating their networking. On facilitating networking, could you say more about the algorithms? Your point about the algorithms, because I think that is a concerning point. And if you could say more about how these algorithms develop the user's content, in your view. And also, if you could, as a follow-up, I don't find any allegations in your proposed complaint that those matchmaking algorithms played a role in the chain of causation that led to specific attacks. Could you say more about that as well? Okay, there's a lot there. I'll start with the algorithms. There's a lot hidden within the word algorithm, Your Honor. We learned on Friday, interestingly, very timely, that Facebook is collecting data on its female users regarding their menstrual cycles. That Facebook now knows, I don't know, their menstrual cycles. Facebook knows about the menstrual cycles of I don't know how many women, but apparently a lot. Stands to reason they're using their algorithms. We don't know this for sure. It all came out on Friday in the Wall Street Journal. Using their algorithms to monetize that information. Exactly how, again, we don't know. The algorithms do a lot. It's not passive. It looks passive because it's unfamiliar to most of us, to me certainly. I would like it more to a bowling ball. When a bowler rolls a bowling ball down the alley, depends how fast he's throwing the ball, it might take a couple of seconds before the ball gets there, and then it creates all kinds of habits. The person who threw the ball is standing there passively during that time. But he did something, right? He caused the ball to roll down the alley and did it in a certain way. When Facebook created its platform, it created these algorithms designed to do certain things inevitably. It's passive. Facebook is passive in the sense that as it's happening, Facebook is standing there twiddling its thumbs, so to speak. But Facebook, the entity, is responsible for all these things that happen, and it did quite a lot. It created this very, very complicated system, which is able to bring people together all over the world. Let's think about what Facebook did in this case that we speak about in the brief. There's a Rule 60 motion pending before the district court. This came out later. It's just a fascinating thing. The Center for Extremism Projects studied that, as we mentioned in the brief. You have a Nambian lone wolf who's minding his own business, interested in terrorism, knows nobody. Through Facebook is now the central bridge for many international ISIS networks around the world, linking Indonesia. Can I just follow up on Chief Justice Katzmann's question, though? Sure. In the district court's decision, and I was going to ask this to the opposing counsel, really, but I'll try it with you. The district court pointed to allegations in your complaint where you say Facebook generates targeted recommendations for each user, promoting content, websites, advertisements, users, groups, and events that may appeal to a user based on their usage history. In this way, Facebook connects users with other individuals and groups based on projected common interest activities, contacts and patterns of usage, et cetera. In other words, it seems to be at least bringing people together with similar interests and targeting particular users and web groups that have particular interests. For example, somebody who's interested in ISIS might be interested in learning how to make a bomb. Would an algorithm arrange for that connection? 100 percent, Your Honor. You know what we're heading to is that content, the use of such algorithms. And I'm not saying they exist. I don't know. But the manipulation through algorithms, does that bring Facebook into a different place? That's my question. As a content provider rather than just a phone book or classified ads where you break out the types of cars. That's the question is, is that manipulation crossing into content? I think the contest with the phone book is excellent. And we mentioned this in the briefs, if I remember correctly. When you have the Yellow Pages, for example, and I want to look up terrorism in the Yellow Pages, I don't think it exists, but let's say, I have to go actively search for it. I have to get at the Yellow Pages, open up the right page, and make phone calls. Facebook does all that work for me. Facebook puts me in contact with people who I would have no access to from all over the world. And in this context, it's interesting because the people that we're talking about live underground, so to speak. They're clandestine because they have to be because what they do is illegal in most countries. And because of that, it's very difficult to contact them. There's no phone number. I can't call what is under ISIS. The only way that I can get to ISIS or Hamas in this case is through entities like Facebook, and Facebook being probably the prime example, where by expressing to Facebook my interest in what Hamas is doing and liking its activities, I'm put in contact immediately, entirely passively, without doing anything. Facebook puts me in contact with ISIS commanders all over the world, and it is multinational. So entities that might not know of each other's existence would know of each other's existence because of these algorithms. They don't simply know of each other. They're talking to each other now through Facebook. So a phone book is the same thing, right? No. I might not know about who provides these types of services, but for a phone book that alphabetizes and gives me the numbers, is that also facilitating? A phone book requires active participation on my part. Facebook requires active participation on your part, and listen until you provide information that allows those algorithms to make connections. There will be no connections, right? One time. So I need to turn to the phone book one time, and there I find the numbers that I need. And make a phone call, and make another phone call, and another phone call. All these people are brought to me. Have you persuaded the Department of Justice to bring a material support case against Facebook? I don't believe we've tried, Your Honor. As far as you know, has the Department of Justice ever attempted to bring a material support claim against Facebook? Your Honor, the ATA was enacted precisely because Congress wanted private parties involved in the enforcement of these statutes. It's very complicated, time-consuming for the government to make a criminal case against these parties. The individuals that are affected most directly have a much bigger incentive to do so. The government could do what you did in your complaint. I thought that they can't. They've chosen not to for whatever reason. I don't know why. But we see very clearly from Congress that this is the reason. This is one of the reasons that Congress wrote the statute the way that they did. They wanted private parties doing this. I mean, that's what Congress says in the legislative history. Well, except that they carved out an exception for folks who are Internet service providers that they won't be treated like the speakers, right? And so that's really, it seems to me, the issue here. Well, it's not an exception to the ATA. It's an exception generally, but it's an exception that applies only when you're suiting a duty as a publisher or as a speaker, which the ATA does not do. But if and when the Department of Justice is persuaded that this constitutes material support, then they could get restitution for all of your clients, right? In theory. And probably without a third coming off the top, right? In theory. Is there anything, a question that I'd ask, I know I packaged several questions in one. Yes, I'm sorry. Is there anything in the proposed complaint that specifically ties, in terms of the chain of causation, specific attacks that caused the plaintiff's injuries? The honest answer is I don't remember, but it's not necessary. Boeing makes this very clear, the Seventh Circuit on Box decision, as well as Holder. Now, Holder was on 2339B, not the civil provisions of the ATA. But there's pages in that decision that would be directly relevant to what we're talking about. By funding these people, what they do is they kill people for a living. That's their business. That's their job. By giving them money, you're making that happen. By giving them money or substantial support, in this instance, through services. You're facilitating that whole process. The amount of the support and tying individual dollars to individual taxes is completely unnecessary. Again, that's clear from Holder. On your aiding and abetting liability argument, would the phone company, let's say, would Verizon be liable if it continued to provide cell service to those who may use the phones to plan attacks? I'll give you the final answer and a more logical answer, for lack of a better word. The answer is no, first of all. But why? A phone book is not making profit through giving me a phone number. I mean, obviously, it sells the books, and there's a marginal profit, perhaps. An additional number that it has there, giving me that information, makes it more valuable a little bit. I'm talking about a cell service, not just a phone book. I'm sorry? A cell service? A cell service, like Verizon provides a cell service. Verizon, first of all, has no idea who these people are, as far as we know. If they did, if they knew that they were providing service to terrorists, facilitating the terrorist communication, perhaps. Perhaps, I mean, it would depend on the facts. But in a normal course, you wouldn't assume that Verizon necessarily knows who it's dealing with.  It uses a name. I don't know the extent to which Verizon has to do background checks on its customers. I would think not very much, but I could be wrong. If you have, let's say, for example, an international cable service like CNN, some parts of Fox may be international, and they broadcast segments about terrorist groups and about the recruitment of terrorists. And if viewers might say, oh, this is an exciting group to join, would those cable networks be liable for aiding and abetting? Certainly not. You see, the ETA does not prohibit talking about terrorism. The ETA does not prohibit advocating for terrorism, as long as you're not providing substantial assistance to the terrorists. What the ETA does prohibit is, for example, the New York Times giving Facebook, giving Hamas, excuse me, a page in which to do whatever they want. You know, here's a page to advertise in or to advocate for what you do, to advertise what you do. That the New York Times can't do. If the New York Times wants to praise Hamas for whatever it's doing because it's decided that it likes what Hamas does, that's perfectly fine. That's not material support, even though, as you point out, Your Honor, it might cause people to then want to join Hamas. That's true. But that's not what the New York Times is doing. They're editorializing, and they're allowed to do that. The ETA doesn't say otherwise. Thank you, Your Honor. Thank you. Chief Judge Katzmann, and may it please the Court, Craig Primus from Kirkland & Ellis for Facebook. Let me begin by just saying that this complaint walks right into the core protection of the CDA. Paragraphs 127 through 155 are replete with allegations about the content that Hamas allegedly placed on Facebook. Then paragraphs 543 to 547 and paragraph 552 all criticize Facebook for not removing this Hamas-based content. And the federal reporters are replete with decisions saying that the decision to remove content or even the failure to remove content that somebody wanted to or perhaps should have removed is protected by the CDA. So this complaint, four square, is pretty straightforward. And I think Judge Garifas recognized that when he dismissed the complaint. With regard— Were you saying that there was no need to go beyond the 12B6 stage of the case to address the special defense? Is that why? Absolutely, Your Honor. There are many cases. Most of these cases are resolved at 12B6. And Ricci said it could be resolved at 12B6. The D.C. Circuit said that, and courts across the country are resolving these at 12B6. And it's what the Jones Court said in the Sixth Circuit, which is that if you don't provide this immunity early in the case, it is essentially lost because then companies like Facebook, which carry content from billions of people, would be sued to death. Because every time somebody posted something that another person didn't like or was offended by, there would be litigation and discovery over it. So courts have, in fact, applied this early in the case. And the face of this complaint certainly supports the rules set out in Ricci. Could I ask you to help me understand the implications of Western GECO, since it's the most recent case of the Supreme Court on the presumption against extraterritoriality? And here I'm really focused on methodological issues, how we should go about thinking about these issues. So this is a little convoluted, so please bear with me. So as you know, in that case, the court looked at a patent statute which stated, and I quote, The court shall award the claimant damages adequate to compensate for the infringement. The respondent in that case argued that the statutory focus was on awarding damages, just as you're arguing here that the focus is on granting immunity. But as I read that, the Supreme Court's case, the decision in Western GECO, it didn't accept that argument. And what it said was, and I'm quoting, What a statute authorizes is not necessarily its focus. And what the court determined instead was that the statute's focus was the conduct for which the statute seeks to provide a remedy. In other words, the court said the infringement. So if that's true, and if I'm misunderstanding something about the Supreme Court's decision, please let me know. If that's true, why isn't the focus of 230C1 the conduct for which the statute seeks to grant immunity? In other words, the provision of information? Yes, Your Honor. I think Judge Droney hit on a good point when he said that this situation we have here doesn't fit neatly into the existing Supreme Court two-step approach to extraterritoriality. Now, I understand your question to be, how do we make this case fit in with what the Supreme Court just said in Western GECO? And I will address that. But I do just want to point out that in Ricci, this court did refer to the CDA as an immunity. So for purposes of both the extraterritoriality issue and that Your Honor was asking, posing counsel about, and for the current question, this is an immunity from suit as recognized by this court. So Western GECO said you can go to the second step without dwelling on the first, so we'll go to the second. And I understand Your Honor's point being that the Supreme Court in Western GECO, in the context of a different statute, did draw a distinction between kind of the conduct or the issue being regulated and how to remedy it. And here, we do believe that the immunity is a domestic act and the lawsuit is the conduct being regulated. We stand by that argument. We think that fits within Western GECO. But in any event, if you want another layer to get behind this immunity, I don't think it's the conduct – well, it is the conduct of providing an interactive computer service, but the policy and findings provisions of the CDA make clear that these were for the benefit of Americans and to promote the development of these companies domestically in the United States. And with a minimal amount of government regulation, and the mechanism for doing that was the immunity that we're here defending in this court. So it would fit comfortably with the Western GECO. One of the challenges, I think, that I have in reading Western GECO is that the court could very well have, you know, flat out approached it methodologically in the way that you are arguing with respect to 230C1, but it didn't. It could have looked – it could have said that the claimant is the party the provision seeks to protect there. It didn't do that. And so I'm trying to, you know, parse it all out. What were they – why did they pursue the course that they were pursuing? Because it doesn't quite fit the, you know, the analysis that you're making. Well, I think I was trying to make a separate point. We do stand by the analysis in our brief, but the separate point I was making is that the CDA, if you look at the findings and policy provisions of that statute, make clear that the purpose of this statute, the focus, is to promote a vibrant and open, minimally regulated Internet in the United States for the benefit of all Americans. And so that could be analogized to the first step of Western GECO, where they talk about the infringement provision. And then the second part is how do you do that? It's through this immunity. But there's nothing about this that would suggest that they're regulating conduct overseas. It's all about lawsuits in the United States to protect companies that distribute content within the United States, which is what we do. Well, the material support alleged here takes place where? California or New York or someplace else? Is there anything in the complaint that indicates where the material support of providing algorithmic analysis and processing information provided by users all around the world? Where does that take place? Your Honor, I do want to be clear before I answer that specific question that in addition to affirming on the CDA ground, we also have argued and believe that this can be affirmed alternatively on the failure to state a claim under the ATA. And we don't believe that there's adequate material support allegations. And one thing I do want to point out is that in Lynn versus Arab Bank, the Second Circuit was clear that merely alleging material support is not enough to state a claim for direct liability. There also have to be the other elements of a violent act and trying to influence another government. Even if they can fit within that one part of the material support statute, they haven't stated a claim for international terrorism. But to the specific question, the complaint is not clear about where the particular service of providing this platform is to people overseas. I thought that your adversary had alleged that the Israeli government has repeatedly contacted Facebook's office in Israel asking it to stop providing Facebook to Hamas. The obligation is in the complaint, Your Honor. And on that point, I do also want to point out because I think it does get lost in the shuffle that Facebook makes effort every single day to get terrorist content off of its platform. It's prohibited on the platform. We understand that people can nonetheless get on and put it in. And Facebook makes efforts every day. Thousands of people are employed to get rid of this stuff. And what the CDA does is gives us a buffer zone to do that diligently. And if we don't catch everything, to not have to defend all those lawsuits. What Judge Stroni, I think, in his questions pointed out is that, or at least by way of a question that you could answer, is the use of these algorithms is a way of creating networks. That is, whereas in a normal course without these algorithms, the individual would have to affirmatively go out and try to figure out who are my friends, who are my allies, who should I call. In the case of the development of these algorithms, they are essentially ways that Facebook creates networks because it makes these entities that might not have been aware of one another, aware of one another. And isn't that an issue? Well, let me address that. And I need to address it, I think, in two parts. Because it both does state a claim that would be barred by the CDA, but as described, it also couldn't possibly state a claim under the Anti-Terrorism Act. But I want to make sure I answer both pieces of that. With regard to the Communications Decency Act, what have been called algorithms is really just a mechanism to make the user content posted by millions or billions of other people more useful and available to all the people who use the platform. And it's no different than Google organizing search results or LinkedIn trying to link up an employer and a person applying for a job. It's the everyday workings of our modern Internet, which has grown up under the protection of CDA 230. And so while there is a negative connotation cast upon this, it is really just the editorial decision that the courts have consistently recognized as protected by the CDA as to how to display, prioritize, in some cases remove, or organize the otherwise completely unwieldy content on one's website. And I would just point out that the plaintiffs do have an allegation in their complaint that these algorithms, which do connect people, but that is the service that's provided, that these algorithms they're saying should be used to remove Hamas' content, which both confirms that this is all inherently bound up in the content. These algorithms and suggestions don't work without reference to the content. And it also confirms that there are cases about removal decision, which courts, including Ricci, have unanimously said is protected. I do want to point out, I think my opposing counsel said that he was drawing a distinction, I believe in response to a question from Judge Sullivan, about the duty versus the causation. I think it was in response to whether this is all about content. And I believe counsel said that content caused the injury, but what they're suing on is duty. Well, that answer confirms that the CDA 230 protection applies, because they're saying one of the critical elements of their claim is bound up with the content in that. Let's say that you had a staff person on Facebook, and that staff person just monitors the various websites and decides that, you know, here are two entities that really should get to know one another, and then directly links these entities together. Would you say that that's part of Facebook's job as a publisher? Does it fit? Yes, certainly. I would say that that determination about how to present the content or how to prioritize it for other people would be part of an editorial decision that would be protected as part of CDA 230. And I should point out, and this case was not… They're two terrorist groups. Well, yeah, I mean, they don't do that, obviously. But, yes, I mean, that would be… Just from the position of whose content is it, it is the content of third parties, and this would be the editorial determination as to where to put it and how to display it and who should see it. That would be covered. And, you know, that type of thing has been addressed in many other cases. And, in fact, one case I do want to just cite for the record because we didn't have it in our brief, but it became much more apparent after we received the reply brief, is the Kimsey versus Yelp case from the Ninth Circuit. It's 836F31263. And the claim there was that Yelp was taking people's reviews. They were consolidating them, giving them star ratings, and then having them distributed either through advertisements on other platforms or on Google. And that is very analogous to the hypothetical just posed, and it's analogous to what's been argued by plaintiffs. And there the Ninth Circuit rejected that claim, said it was covered by CDA 230. And it said Yelp is not liable for disseminating the same content in essentially the same format to a search engine as this action does not change the origin of the third-party content. And they went on to say that, simply put, proliferation and dissemination of content does not equal creation or development of content. And the Ninth Circuit is not the only court that has gotten at that point. The Eleventh Circuit in the Dalbanco versus Google case said Google's use of algorithms to manipulate search results is protected. And in each of those cases you could, and I think the Ninth Circuit said this in Kimsey versus Yelp, you could recharacterize the function as being transformation rather than presentation. And the Ninth Circuit rejected that and said it would put a big hole into the CDA. Briefly, I don't know if I'm, oh yes, please. And the reason really for the algorithms is to help people get in touch with others of similar interests, but it's also for you, you get more advertising revenue because you're trying to seek out people that may have similar interests, create a broader broadcasting group for your advertisers, right? Yes. There's a reason behind the algorithms. Yes, but that would not, I mean that's just stating what Facebook's business is, but that would. I don't think it's wrong. Yeah. That's the reason for the algorithms, right? Well, it's to make the platform more useful to other people. If it turned out historically that turned out to be very profitable business, but any online platform when it starts out is trying to, they obtain content, they present it in a certain way that people might find more useful than the person who did it before. And if it turns out to be profitable, that's great, and maybe not. But all of them would be protected because that's the basic function that is protected by the CDA. Your representatives, somebody who works for Facebook decided that they were going to permanently seek out Hamas and Al Qaeda and tell them what a great service Facebook provides for what they hope to achieve and touts the effectiveness and the efficiency of Facebook and encourages them to use Facebook. Would that change the viability calculus? Well, I don't think so for purposes of CDA. It might make it a clearer case of stating a claim, putting aside the CDA of maybe being covered under the A2A. You're not immune from suit even under that scenario? Yes, as long as Facebook's not creating the content or requiring the illegality. I think the roommate's decision in the Ninth Circuit gets at that distinction because in roommates, the Ninth Circuit addressed a situation where users were required to answer questions that when they answered them were violative of the Fair Housing Act. And the Ninth Circuit said you can't do that. But then the balance of the opinion, which often gets overlooked, said that if people are posting their own comments on the roommate's website saying discriminatory or terrible things, that roommates would be protected under the CDA against claims relating to that content because it's third-party content that they haven't sponsored or written. And I do want to be careful because, well, I think I'll leave the answer at that, Your Honor. There is a distinction that the cases have drawn that makes sense because once you open that up, it would be very difficult to determine what would be covered and what would undermine the CDA. I do want to just briefly, if I may, address the Anti-Terrorism Act because we do want to make clear that we believe that a claim has not been stated under that. And I already pointed out under Arab Bank v. Lind that material support, even if they pled it, would not be enough. But there is also an issue of proximate cause. And, Your Honor, Chief Judge Katzman, I think you pointed out that there's no allegation that the algorithms played a role in the chain of causation as set forth in this complaint in this case. And that is absolutely true. There are five terrorist incidents that are at issue under the ATA because they are the ones that involved Americans. The complaint goes through many, many of Hamas's terrorist acts, but the five that matter are the ones that involved Americans. And there's no allegation that Facebook was used in any of those to support, finance, or even was even used by the terrorists in connection with those particular attacks. But this is not something Judge Gareth has determined, right? He did not. This would be an alternative basis for affirmance because it is on the face of the complaint. But if the core allegation is that Facebook is providing material support, what we're pointing out is that with the five incidents that relate to Americans, it just doesn't line up. Because the typical allegation is that people from Hamas say bad things on Facebook, then a terrible attack happens that was not talked about on Facebook, and then afterwards somebody from Hamas praises it. That's not proximate cause. There's just no allegation that Facebook was in the chain of causation that led to these five particular issues. And then finally, under aiding and abetting, again, it's the same point. There was no allegation that Facebook was used for any particular attack, and that would be just a necessary element in order to get past first base on an ATA claim. Unless there are any questions. I'd like to just bring you back to the extraterritoriality analysis and just trying to push your argument, if I could. So let's say that we were to find that the focus of 230C1 is on limiting liability and that the relevant conduct is the domestic lawsuit in which the statute is brought into play. How would you respond to the view that that would entirely exempt the provision from extraterritoriality analysis because the relevant conduct would always be domestic? Well, I don't think that that would undermine the analysis. It just happens that in this particular case, yes, it would be a domestic application each time. But I don't think the Supreme Court's jurisprudence forecloses that possibility. And I would also add that in each of these cases, there's a very different statutory language, very different statutory construct. And if that's how it happens here, then that would just be the way it played out under the Supreme Court's analysis. But your view is one could reach your view and also say that it doesn't mean that every liability limiting statute becomes exempt from the presumption against extraterritoriality. Absolutely not. These cases are done statute by statute. And in the context of what happens for CDA 230 may very well be different from other statutes that are not before the court. And I don't think it would necessarily mean that they all get the same treatment under the Supreme Court's jurisprudence. The court would have to do the analysis. Thank you, Your Honor. Mr. Cass, you'll have two minutes. Thank you, Your Honor. The opposing counsel said that the complaint is unclear as to where Facebook services were provided. Respectfully, that's not entirely correct. The complaint does say that the services were provided in Israel, in the West Bank. The complaint goes into detail, as Chief Justice Katzman mentioned, regarding Benjamin Netanyahu's statements regarding Facebook and to Facebook. The proposed amended complaint goes into more detail regarding Facebook's review in Ireland, if it happened. So that is there. Two, Facebook's role through these algorithms, I wanted to make one point that's very clear. Facebook sees itself and has demonstrated a tremendous ability to impact the way people think. Through its news feed, for example, Facebook has impacted emotion, and it was rather proud of being able to do that.  Facebook is able to give us information that makes us happy, makes us sad. It motivates us and causes us to desist from various actions. Facebook takes a very, very active role in the things that it does. Moving on to Lindy, very briefly. Lindy did say that, and it's true, it's from the face of the statute, that we have to comply not just with 233A or D, whether you're primary liability or secondary liability, but also 23311, which is the definition of international terrorism. Regarding secondary liability, the act of international terrorism was the act of Hamas against my clients. There's no question that that was international terrorism. There's no question of proximate causation in that case. The only question, again, as I mentioned before, is whether or not there was, in terms of secondary liability, were met, and they were, as the briefs make clear. With regard to primary liability, I refer the court again to Boehm. The Seventh Circuit's en banc decision there makes very clear what to do. And Rothstein, the opinion regarding proximate causation, quotes Boehm favorably. It doesn't adopt Boehm because it wasn't relevant to what was going on in that case, but it discusses Boehm, and it says, in those types of facts, Rothstein was dealing with support to Iran, which is sovereign. It has lots of things that it does that are perfectly legitimate and good. Hamas is a terrorist organization. And as Boehm speaks out and as Rothstein provided approval, to an extent at least, when you give resources to a terrorist organization, what you're doing, Congress has decided, is bad and is liable. It's grounds for liability, both criminal and civil. Thank you, Your Honor. Thank you both for your arguments. It's a complicated case. Thank you so much. Formal reserve decision. We'll hear the next case, United States v. Richards. Good morning, Your Honors. Rule 11G allows a defendant to withdraw a plea at any time before sentencing if he can show a just and fair reason for the withdrawal. The rule doesn't define what a just and fair reason is, but on its face it contemplates that there will be situations where a defendant has sworn under oath that he's guilty of the crime charged, he's factually allocuted, and he has testified that his plea is voluntary, all prerequisites to the court accepting the plea, and who nonetheless may be permitted to change his mind. We believe that Errol Richards' case presents just those circumstances. One of the things that's absolutely clear in this case is Mr. Richards always maintained he wanted to go to trial. The appendix is rife with letters, e-mails to his counsel, Kaiser and Levitt, saying, I want to exercise my constitutional right to go to trial. Not always, right? He walked into court and pled guilty. Well, that's the key here is what happened to make him change his mind. At the day of the plea, even, Kaiser's notes reflect that he said, I don't want to take a plea. What happened, and he tells it to the judge within a week, is he felt ambushed and panicked. And why is this case different? Why was this so threatening to this man? Why? I mean, just to be clear, so he reads from a paragraph that his counsel prepared, right? And the magistrate judge who conducted the plea noted that your client was reading from his notes and sought to confirm that what he had said was complete and accurate. And he responded, yes, ma'am, and that he didn't want to add anything else. That did happen. Oh, absolutely that happened. And I think that will always happen when somebody like me is standing up for this court arguing there should be a withdrawal of the plea because if he hadn't answered yes to that question, the magistrate could not have accepted the plea. Although I think she perceived hesitation, and in truth it's the attorney who stands up and says, oh, everything's okay, and then he says correct. That gets to the question of what happened in these few days to make this man change his mind. Why we contend this plea was not voluntary, and the importance of his acting as quickly as he did. He thinks he's going to trial in two weeks. His attorneys have been trying to get him to take a plea because they think it's in his best interest, but he's been adamant. And then all of a sudden on the evening of trial, he's told that the government has this motion in limine and his attorneys want more money. And then the day before the plea, at the reverse proper session, he's told what that motion is about. And that motion changed the entire dynamic of the case. This was a sting operation. Irma Richards wasn't found with any drugs. And now all of a sudden he's told that the government is going to put on the stand a cooperating witness who's going to testify that Richards went in jail. Basically this is a jailhouse smit. When in jail, Richards boasted to him that he committed multiple murders in Jamaica, which Richards denies. That's pretty frightening stuff, and he's never told. There's a lot of frightening stuff that happens in the run-up to trial. But the magistrate judge specifically told your client that he had the right to change his mind and persist in his not guilty plea and go to trial, right? And he did change his mind, and he did so very quickly. But I'd like to get into his mind at that moment because this is what happens. You know, he thinks he's going to trial on a fairly straightforward sting case. He finds out now that he can't get a fair jury in his mind because they're going to hear he's a murderer. His attorneys do not tell him that that motion can be challenged. In fact, in paragraph 16 of Richards' declaration, he states they told him the only way to avoid this was to take a plea. And what I think is very telling is that Mr. Tizer meticulously goes through Richards' affidavit to dispute certain portions of it, but he doesn't dispute that. And he even disputes something else in paragraph 16. And he doesn't dispute that they asked for more money. So what we're left with is a defendant who's panicked. He's panicked. He goes in. He reads these two sentences. He says, I have to do this now. And he reacts immediately. And that's really key in this case. On the motion in limine, the counsel's notes from a proper session the day before the plea suggest that that motion in limine was described to Richards on that day and that he was, quote, unquote, nonplussed by that description. That's one of the reasons I think we would need an evidentiary hearing in this case. I actually find that to be unbelievable that you would hear that you're going to trial on the case he thought he was going to trial on and to be told that the jury's going to hear that this Jamaican middle-aged man is a multiple murderer and he would be nonplussed as opposed to feeling quite coerced. And they brought him in the very next day for the plea, and I do believe he was panicked. And he tells this to the judge within a week. He tells the judge, and he has no relationship with counseling. He's essentially acting pro se. And within a week, he tells the judge, please help me. I want my plea reviewed. I want an opportunity to correct this wrong. And the timing in this case is so critical because what it shows is that this man was not playing games. He wasn't waiting to find out what the sentence would be, as is in so many of the cases. He said he didn't do it. Oh. If I had more time, I could go into all the places in the record. A week later. Yes. He said, I'm innocent, too. He did, as best he could, he said he dealt with that issue not knowing it was a factor. But then thereafter, and before the court decided the motion to withdraw, twice in the record, there are letters that Richards wrote to counsel that were part of the district court's record where he in detail goes through all of the reasons he believes he can challenge the government's evidence. It's the equivalent of saying, I'm innocent. These phone calls that were recorded are not complete. I think they were tampered with. This money, you know, this conversation about the money was not accurate. He has always maintained his innocence. Mr. Kaiser said as much. Carbon instead of drugs, right? Is that right? Carbon? I can't. I don't know what that is. There were many things that Mr. Kaiser says in his affidavit that his counsel threw out to him. And many types of issues that were going on. But if you read, and they're not easy to read, I admit that. But if you read his e-mails, you really, you know, concentrate on what he's really saying is, yes, you've got these recordings. But I can test those recordings, and I want a jury to hear my challenge to those recordings because I don't think this is accurately portraying what happened in this situation. But if the jury is going to hear I'm a murderer, I don't think, you know, I've got a fair shot. And, again, he's not playing games. And because he's not playing games, he's not waiting for a sentence. He's not waiting to find it. It just seems that he's a guy who couldn't make up his mind, and then he just was having sort of buyer's remorse a week later. But you say that's not playing games. It seems to me that would be consistent with playing games. May I answer? Okay. All right. I guess I should ask you. Can she answer the question? Yes? Okay. Of course. When a defendant moves to withdraw his plea, and that's what Rule 11 is all about, there's going to be always, you know, a complexion of buyer's remorse. He's stood up in court and said I'm guilty, and now he's remorseful. But in so many of these cases, Your Honor, you see that the defendant is waiting for the sentence. He's waiting to see if the government case falls apart. He's waiting and waiting and waiting to find out if what he did was a mistake in retrospect. This man realized right away he made a momentous mistake, and he tried to undo it. If that doesn't count in his favor, then I don't really understand Rule 11. Your view is if they try to withdraw before they get a PSR or before sentencing, then that presumptively should be a basis for them to get that. That's one of the things. There are other circumstances. You could be waiting to see if the government's cooperating witnesses disappear or are no longer available. You could be waiting for other – excuse me? After a plea? Well, you may feel that the government had a strong case, and now you find out the government's case has fallen apart, so you want to go to trial. There are cases like that. I'm not saying every time that that's – that there's one hard and fast rule. But this court has said, and I think it said it in the Crespo case, the timing is critical because the timing reflects whether the defendant truly realizes he made a mistake. And if Rule 11 doesn't ever allow a defendant to withdraw a plea because he made a mistake, feeling he was under pressure, then I'm not clear what the point of Rule 11 is, except in those very rare instances where you could prove ineffectiveness of counsel or some kind of true involuntariness because of incompetence or something. But that's not what the rule says. The rule says fair and just, and I believe Mr. Richards has met all the factors that this court has announced to show he had a fair and just reason for withdrawing a plea. Now, Mr. Richards submitted pro se materials after the district court had decided the motion. So how do we consider those materials when the district court didn't have them when it decided the motion? I think the record's a little bit confusing, but I think the district court said it was going to consider them. He filed – the district court filed them. What happened is when the motion to withdraw was made, his counsel wrote a fairly, you know, bare-bones statement. He asserts his innocence. He says, I asked counsel to submit something further. Counsel didn't, so he took it upon himself to write a declaration in prison. He submits it to the court, and the court says, you know, at the beginning of the sentencing, I'm making this part of the record, and I've read it. Essentially, I get the feeling, at least. It's not entirely clear, but I get the feeling that the court read it and understood that he had the power to revisit this decision based upon this assertion of innocence. So I think this court can consider it as well, as well as I want to mention two documents, the June 30 mail that he wrote to his counsel on the day that the plea offer was supposed to expire, and a June 12 handwritten letter he wrote to his counsel, both documents the district court had before it issued its decision. It doesn't mention it, where he really, in detail, explains to his counsel why he thinks he's innocent of these crimes. Thank you. Thank you. Good morning, may it please the court. My name is Emil Bovee. I represent the government on appeal, and I represented the government in the district court as well. I'd like to make one quick factual point and then address some of the other arguments about the claim of innocence. The factual point I want to make is that this is not a defendant who said he wanted to go to trial throughout this case. There was an e-mail in the record before Judge Stein dated March 12, 2015, where this is Appendix 167, the defendant said, that's why I really don't want to go to trial. This is a defendant who was looking to get the best deal that he could through plea negotiations throughout, and then after his guilty plea, had buyer's remorse, and wanted to press the issue a little further to see if he could get yet still a better deal. Now, with respect to the factor that Judge Stein considered. May I ask you one quick question, just so I'm clear. The letter that was submitted pro se was submitted after Judge Stein had denied the motion to withdraw. Is that correct, or am I misunderstanding? Are we talking about the letter that's been described? Pages 257 to 263 of the appendix. Yes, Judge. That was submitted. I think the sentencing transcript reflects that Judge Stein and counsel at the time, Mr. Acevedo, received that. It's an e-mail, but it sounds like the defendant printed it and handed it to counsel on the day of the sentencing. But Judge Stein still considered the content of that, and I think he treated it essentially as a motion for reconsideration, and he said essentially. He didn't use these words, but having considered it, he elected not to reconsider the decision he'd already made denying the motion. And I think in terms of fact-finding and what happened here with record development, it's important to keep in mind that this was a sentencing with a PSR that said very much the opposite of what the defendant was claiming. The PSR, the pre-sentencing report said, this is the offense conduct, this is what the defendant did that made him guilty. And there's a portion in the sentencing transcript where Judge Stein carefully goes through with counsel and the defendant whether he had any objections to the PSR. And at the end of the day, Judge Stein carves out whether the defendant's complaints about Kaiser and Levitt. He says, otherwise, do you have objections to the offense conduct in the PSR? And both counsel and defendant say, no, that I don't. So in terms of was there a claim of innocence supported by the record or with reference to evidence in the case, the defendant essentially abandoned that at the sentencing. So Judge Stein was right to consider it as a motion for reconsideration. It's clear from the record that he did. He was also correct when he did the fact-finding process at sentencing in finding that it really wasn't entitled to that much weight because there's a PSR at that point where the defendant is acknowledging his guilt. Otherwise, we would have had a hearing in connection with sentencing where we actually offered the recordings and that could have been resolved, but that's not the way that the defendant proceeded. If you look at the timeline, so in trying to understand the reasons for the long delay, you've got Lawrence Gershwer appointed as counsel. And looking at Gershwer's declaration, pages 199 to 201 of the appendix, it indicates really in virtually every paragraph his own understanding that Richards wanted to withdraw the plea. And ultimately what happens, as I understand it, is that Mr. Richards gets new counsel because Gershwer was unwilling to do so. And his new counsel did so a few weeks later. So why doesn't that suggest that Richards, in fact, wanted to withdraw and that it wasn't the indecisiveness of Richards, but rather Gershwer's determination that it wouldn't be prudent or make sense, whatever, to file a motion to withdraw? Judge, first as a factual matter, I think that what was important in the Gershwer declaration is at appendix 200 in paragraph 6, the sentence beginning despite, where the sentence ends before deciding on a course of action. And I don't think it was an abuse of discretion for Judge Stein to look at that paragraph and that sentence when Mr. Gershwer says, yes, Mr. Richards had a general interest in seeking to withdraw his plea, but before deciding whether to file that motion, he wanted to have the case reevaluated. So I think as a factual matter, it's not quite the case that Mr. Gershwer ignored Richards' sentiments or his interests. What happened was Mr. Richards agreed to have a new attorney reassess the record so he can do a cost-benefit analysis and make a decision about whether he wanted to actually file that motion. But in any event, Judge Stein was very sensitive to this, and it's clear from the transcript where he issued the ruling. He said, on the one hand, I credit that the July 6, 2015 letter is an expression of interest in withdrawing your plea. On the other hand, you didn't formally file the motion for almost a year after the fact. And so on balance, Judge Stein found that this factor, timing, did not particularly support a motion, and that's telling in the context of a motion where the defendant had the burden and the standard is a strict one. Well, how does that work then with respect to prejudice? Is it prejudice as of the week after the plea or prejudice as of the year after the plea? I think in this case, there was prejudice at both points because what we're talking about are law enforcement witnesses who are engaged in other investigations using covert identities. So there's discussion of the undercover officer where there was actually an application being prepared to try and close the courtroom. So there was litigation risk on that about whether that would happen, whether or not the government could protect that undercover's identity, whether then that undercover becomes compromised and can be used in future investigations. There are also multiple confidential sources. That's all as of the first week after the plea? Yes, Judge, because the government is entitled to the benefit of the bargain that it struck, and part of the reason that that bargain was struck, an important reason, was to protect those witnesses' identity, not just for safety reasons, but so that they could be used in subsequent cases. And so, yes, we would have been prejudiced right after the plea or a year later by being required to have those witnesses come into court and testify publicly and risk compromising their identities, not just in that case but in other investigations that they were supporting. If there are no further questions... Are you seeking to enforce the appeals waiver that was in the plea agreement? No, Judge. Thank you. If there are no further questions, I'm going to rest on my brief for the remainder of the audience. Thank you. I just want to quickly address a couple of points. The government has said that this was all about the sentence, and I think the record refutes that. First of all, when he's presented with the draft plea agreement on May 8th, and this is in the appendix, his attorney's notes say that he said, no, I don't care if I get 20 years, safety valve notwithstanding. It wasn't about the sentence for him. It was about the right to go to trial. He did try to negotiate a safety valve. He tried to negotiate a role in the offense adjustment as being off the table. He never got it. He also told Mr. Gersher, I don't want to go to probation. And if he had gone to probation during this period when Mr. Gersher was doing whatever he was doing, he might have found out what the adjustment for a supervisory role would be and whether he had a chance of raising supervisory roles. He didn't want to do that. He wanted to go to trial. As to Mr. Gersher, there was a little confusion about his role because he thought Kaiser and Levitt had withdrawn his counsel. And so he thinks he's counsel, he's going in to review the case. He says to his client, can I review the case? His client says, yes, review it, but directed him, that's in the affidavit, directed him to do research on the motion to withdraw and never deviated from that viewpoint that he wanted to withdraw. Did you get to the claim of legal innocence? The point made by your adversary is that at the time of the sentencing, he concedes all the facts in the PSR that are inconsistent with a claim of legal innocence. I really think that that is not exactly what happened. Mr. Richards is asked at the beginning of the sentence, and if you read the first pages of the transcript, they begin at like 270, and the judge is questioning him, and he says, do you have any objections? And he goes back and forth with the judge, and at one point he says, no, sir, what objections I have is what I said, what was given to me to read in the other portion by Mr. Nicholas Kaiser, what I had to read. And then he goes back that, you know, my objections have to do with my profession of innocence, essentially, and your Honor, that's why I'm filing this today, and yes, I have objections. He goes on and on and on. There's like ten pages before the judge finally gets to the sentence, because during that time, Mr. Richards, perhaps inelegantly, but he's saying to the judge, I am professing my innocence. Then, as a technical matter, counsel says we don't have objections to the factual statements in the PSR. I don't even know if Mr. Richards understood what that meant, because, you know, that's a technical submitting objections to the PSR, but he begins right off the bat telling the court, yes, I do have objections. My objections have to do with the fact that I believe I am innocent. I want to see if there's anything else I want to... Oh, just the prejudice question. First of all, the district court found no prejudice, and the government didn't raise it in its brief. If the district court had dealt with the initial letter as, in effect, a functional equivalent of a motion to withdraw and held a hearing right then and there, it's inconceivable the government would really set for prejudice, because they were ready to go to trial in two weeks, and that would have been a way to handle it, and we maintain he should have held an evidentiary hearing in any event, because just believing something that Mr. Kaiser said over what Mr. Richards said, because Mr. Richards is the defendant, Mr. Kaiser is the lawyer, without hearing from Mr. Leavitt, if you look at the letter, the critical letter to the court on July 7th, virtually every paragraph he says, I told Mr. Leavitt, I told Mr. Leavitt, I told Mr. Leavitt, I told Mr. Leavitt, yet we get an affidavit from Mr. Kaiser and we never hear from Mr. Leavitt. There was serious conflicts here about what happened in those few days, and an evidentiary hearing would have helped resolve those conflicts. No questions? Thank you. Thank you. Thank you both for your arguments. The court will reserve decision. The final case on the calendar, Lando v. Eisenberg, is on submission. The clerk will adjourn court.